# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 28 2019, 10:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Richard K. Muntz
LaGrange, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Patricia C. McMath
Matthew S. Koressel
Deputy Attorneys General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of C.C., Mother,[1] Z.A.C., Father, and M.J.C., Child, Z.A.C., *Appellant-Respondent,* v. | February 28, 2019 Court of Appeals Case No. 18A-JT-2344 Appeal from the LaGrange Circuit Court The Honorable G. David. Laur, Senior Judge Trial Court Cause No. 44C01-1804-JT-7 |

---

[1] We note that, although Mother's parental rights were also terminated, she does not join in this appeal. However, under Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

**Kirsch, Judge.**

[1] Z.A.C. ("Father") appeals the juvenile court's order terminating his parental rights to his minor child, M.J.C. ("Child"). Father raises the following restated issue on appeal: whether the juvenile court's judgment terminating his parental rights was supported by clear and convincing evidence.

[2] We affirm.

## Facts and Procedural History

[3] On February 7, 2017, Indiana Department of Child Services ("DCS") received a report from a babysitter that Child, born July 16, 2014, had several bruises and injuries to her body, which were consistent with injuries caused by an adult hand. *Appellant's App. Vol. 2* at 13-14. At that time, Child resided with C.C. ("Mother"), and Father did not live with them. *Id*. at 13. DCS interviewed several adults who had been in contact with Child, including Father and Mother, and none of them could provide a consistent explanation for the injuries. *Id*. at 14-17. At that time, Father told DCS that he noticed marks and

bruises on Child's face and body on February 5, 2017 and returned Child to Mother's care without contacting anyone. *Id*. at 16. Child was removed from Mother's care on February 7, 2017 and placed in foster care. *Id*.

[4] On February 9, 2017, DCS filed a child in need of services ("CHINS") petition, alleging that Child's physical or mental condition was seriously impaired or endangered due to the parents' inability, refusal, or neglect to supply Child with the proper care or supervision. *Id*. at 13. On February 15, 2017, the trial court ordered Child to be placed with Child's paternal grandmother and paternal step-grandfather, with whom Father also resided. On May 10, 2017, Father and Mother admitted the allegations in the CHINS petition, and Child was adjudicated to be a CHINS. A dispositional hearing was held on June 14, 2017, and Father was ordered, among other things, to: enroll and participate in any programs recommended by DCS; secure and maintain a legal and stable source of income; not use or consume any illegal controlled substances; obey the law; maintain weekly contact with DCS; and provide Child with a safe and secure environment. *Pet'r's Ex*. 1 at 13-15. On November 17, 2017, Child was placed in a foster home where she remained for the duration of the termination proceedings.

[5] On May 7, 2018, DCS filed a petition to terminate Father's parental rights to Child. A hearing on that petition was held on August 8, 2018, and evidence was heard regarding Father's compliance with the juvenile court's orders. The evidence showed that Father had a criminal record and was incarcerated for a portion of the underlying CHINS case. In October of 2016, Father was

convicted of domestic battery. *Tr. Vol. II* at 51. During the underlying CHINS case, Father was charged with possession of methamphetamine in July 2017, which resulted in a conviction in February 2018. *Id*. at 53. After that charge was filed, Father was incarcerated for approximately thirty days before being released to Serenity House, where he resided from August 8, 2017 until November 27, 2017. *Id*. at 59. After pleading guilty to the charge, Father was placed on house arrest. *Id*. at 59-60. Father failed a drug screen on February 15, 2018 and was, therefore, incarcerated from that date until May 3, 2018 for violating his probation. *Id*. at 60. Throughout the underlying CHINS case, Father was incarcerated for a total of four months. *Id*. at 61.

[6] During the termination hearing, Father testified that he "can" have issues with substance abuse. *Id*. at 62. On June 29, 2018, Father tested positive for amphetamine, methamphetamine, and THC. *Pet'r's Ex*. 7 at 88. Less than a month later, on July 21, 2018, Father tested positive for THC. *Id*. at 85. At the hearing, Father testified that he has never sought counseling for his substance abuse issues. *Tr. Vol. II* at 62. Family case manager Nicole Arroyo ("FCM Arroyo") testified that at the May 9, 2018 review hearing, she requested that Father start substance abuse treatment and even referred him to services. *Id*. at 136. However, at the time of the termination hearing almost three months later, Father had not begun treatment. *Id*.

[7] As to employment, the evidence showed that, following his release from incarceration in May 2018, Father was employed but only had that job for two weeks. *Id*. at 48. At the time of the termination hearing, Father had new

employment, but had only begun working there two weeks before the hearing date. *Id*. During the pendency of the case, Father did not have his own home. When Child was first removed, Father was living with his mother and step-father, and after he was released from incarceration, he began living with his ex-sister-in-law. *Id*. at 61-62.

[8] Evidence was presented that, over the course of the proceedings, Father had different levels of compliance with the DCS case plan. A court order from September 6, 2017, stated that Father had partially complied with the case plan, but had not visited Child. *Pet'r's Ex*. 1 at 17. Father was found to have complied with the case plan and to be attending visitation with Child at a February 7, 2018 hearing. *Id*. at 21. A May 9, 2018 Order on Periodic Case Review, however, found that Father had not complied with the case plan and had not participated in services, had not enhanced his ability to fulfill his parental obligations, had not visited with Child, and had not cooperated with DCS. *Id*. at 24. FCM Arroyo testified that she never received notification that Father completed the terms of his probation as required. *Tr. Vol. II* at 126-27. Court Appointed Special Advocate Lee Marki ("CASA Marki") testified at the termination hearing that Father had not been meeting with her as required and that she was only able to meet with him about two or three times throughout the proceedings. *Id*. at 161-62. CASA Marki stated that she did not believe that Father had completed services and was only made aware of Father's employment by his testimony at the termination hearing. *Id*. at 163.

[9] From the date of Child's removal from Mother's care on February 7, 2017 until the date of the termination hearing, Child was consistently out of the care of Mother and Father. From February 7 to February 15, 2017, she lived in licensed foster care in LaGrange County, Indiana. On February 15, 2017, the juvenile court ordered Child to be placed with Child's paternal grandmother and paternal step-grandfather, with whom Father also resided. From there, Child was placed with her half-brother's paternal grandmother. *Id.* at 128. Child was then placed with her foster family and resided with them from November 17, 2017 through the date of the termination hearing. *Id.* at 118. At the termination hearing, the foster mother expressed her desire to adopt Child, and adoption by the foster family was supported by CASA Marki, who testified that Child had become integrated with the foster family. *Id.* at 124, 163. FCM Arroyo also testified that the DCS's permanency plan for Child was adoption with her foster parents. *Id.* at 140.

[10] At the conclusion of the hearing, the juvenile court took the matter under advisement. On August 27, 2018, it issued its order terminating Father's parental rights to Child. Father now appeals.

# Discussion and Decision

[11] As our Supreme Court has observed, "Decisions to terminate parental rights are among the most difficult our trial courts are called upon to make. They are also among the most fact-sensitive—so we review them with great deference to the trial courts[.]" *E.M. v. Ind. Dep't of Child Servs.*, 4 N.E.3d 636, 640 (Ind. 2014).

While the Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child, and parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *Bester v. Lake Cty. Office of Family & Children,* 839 N.E.2d 143, 145 (Ind. 2005); *In re T.F.,* 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied.* Parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *In re J.C.*, 994 N.E.2d 278, 283 (Ind. Ct. App. 2013)*.* The purpose of terminating parental rights is not to punish the parent but to protect the child. *In re D.P.*, 994 N.E.2d 1228, 1231 (Ind. Ct. App. 2013). Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly harmed such that his physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

[12] When reviewing a termination of parental rights case, we will not reweigh the evidence or judge the credibility of the witnesses. *In re H.L.*, 915 N.E.2d 145, 149 (Ind. Ct. App. 2009). Instead, we consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* Moreover, in deference to the trial court's unique position to assess the evidence, we will set aside the court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id*. at 148-49. A judgment is clearly erroneous only if the

legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *In re S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004).

[13] Where, as here, the juvenile court entered specific findings and conclusions, we apply a two-tiered standard of review. *In re B.J.*, 879 N.E.2d 7, 14 (Ind. Ct. App. 2008), *trans. denied*. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id*. A finding is clearly erroneous only when the record contains no facts or inferences drawn therefrom that support it. *Id*. If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied.*

[14] Before an involuntary termination of parental rights may occur, the State is required to allege and prove, among other things:

> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State's burden of proof for establishing these allegations in termination cases "is one of 'clear and convincing evidence.'" *In re H.L.*, 915 N.E.2d at 149. Moreover, if the court finds that the allegations in a petition described in section 4 of this chapter are true, the court *shall* terminate the parent-child relationship. Ind. Code § 31-35-2-8(a) (emphasis added).

[15] Father argues that the juvenile court erred in finding that DCS met its burden of proof to support termination of his parental rights. Specifically, Father contends that DCS failed to prove that there was a reasonable probability that the conditions that resulted in Child's removal or the reasons for placement outside of the home would not be remedied because Child was removed due to unexplained injuries while in Mother's care, and there were no allegations against him. He asserts that he was not part of the conditions that led to Child's removal and that DCS offered him very few services and offered no evidence that he was not capable of making progress to improve his situation. Father further argues that the DCS failed to prove that there was a reasonable probability the continuation of the parent-child relationship posed a threat to the well-being of Child and that there was no evidence that he had the opportunity to parent Child apart from Mother, and it was mere speculation that the continuation of the parent-child relationship would pose a threat to Child.

[16]     In determining whether there is a reasonable probability that the conditions that led to a child's removal and continued placement outside the home would not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, we must ascertain what conditions led to the child's placement and retention in foster care, and, second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *E.M.*, 4 N.E.3d at 643 (quoting *K.T.K.*, 989 N.E.2d at 1231). Pursuant to this rule, "trial courts have properly considered evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment." *In re D.B.*, 942 N.E.2d 867, 873 (Ind. Ct. App. 2011). In addition, DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Involuntary Termination of Parent-Child Relationship of Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007). "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *E.M.,* 4 N.E.3d at 643. When determining whether the conditions for the removal would be remedied, the trial court may consider the parent's response to the offers of help. *D.B.,* 942 N.E.2d at 873.

[17]    Here, the conditions that led to Child's removal were the presence of unexplained bruises and injuries on Child's face and body and the fact that, although aware of the injuries, neither Father nor Mother sought medical attention for Child. *Appellant's App. Vol. 2* at 19. According to DCS's "Request for Taking or Continued Custody," despite being aware of the injuries to Child's head, face, eye, and torso, Father failed to seek medical treatment as a responsible parent would. *Id*. Additionally, in its CHINS petition, DCS alleged that Father "stated he returned [Child] to the care of her Mother" without ascertaining how the injuries occurred, even though Father acknowledges that the injuries happened while Child was with Mother. *Id*. at 16.

[18]    As a result of the CHINS determination, Father was ordered to enroll and participate in any programs recommended by DCS; secure and maintain a legal and stable source of income; not use or consume any illegal controlled substances; obey the law; maintain weekly contact with DCS; and provide Child with a safe and secure environment. *Pet'r's Ex*. 1 at 13-15. However, the evidence at the termination hearing showed that Father was only sporadically employed over the duration of the proceedings, only securing employment for a total of four weeks. *Tr. Vol. II* at 48. Following his release from incarceration in May 2018, Father was employed, but only had that job for two weeks, and at the time of the termination hearing, he had new employment, but had only been working there for two weeks. *Id*. The evidence also showed that during the pendency of the case, Father did not have stable housing. When Child was

first removed, Father was living with his mother and step-father, and after he was released from incarceration, he began living with his ex-sister-in-law. *Id.* at 61-62.

[19] Furthermore, the evidence showed that Father was not able to obey the law or abstain from consuming illegal substances as the juvenile court had ordered. The evidence showed that Father was incarcerated for a total of four months throughout the proceedings. *Id.* at 61. Father was charged with possession of methamphetamine in July 2017, and after the charge was filed, he spent approximately thirty days incarcerated before being released to Serenity House, where he resided for almost four months. *Id.* at 59. After pleading guilty to the charge in February 2018, Father was placed on house arrest. *Id.* at 59-60. He then failed a drug screen on February 15, 2018 and was, therefore, incarcerated from that date until May 3, 2018 for violating his probation. *Id.* at 60. Additionally, on June 29, 2018, Father tested positive for amphetamine, methamphetamine, and THC, and on July 21, 2018, he tested positive for THC. *Pet'r's Ex.* 7 at 85, 88. Father testified that he has never sought counseling for his substance abuse issues, even though FCM Arroyo had requested that he start treatment and referred him to services. *Tr. Vol. II* at 62, 136.

[20] Evidence was also presented that, over the course of the proceedings, Father had different levels of compliance with the DCS case plan. A court order from September 6, 2017, stated that Father had partially complied with the case plan, but had not visited Child, and at a February 7, 2018 hearing, Father was found

to be complying and to be visiting Child. *Pet'r's Ex.* 1 at 17, 21. However, a May 9, 2018 Order on Periodic Case Review, found that Father had not complied with the case plan and had not participated in services, had not enhanced his ability to fulfill his parental obligations, had not visited with Child, and had not cooperated with DCS. *Id.* at 24.

[21]  DCS is not required to rule out all possibilities of change; it need only establish that there is a reasonable probability the parent's behavior will not change. *In re Kay L.,* 867 N.E.2d at 242. "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. Also, as we have recognized, "Even assuming that [the parent] will eventually develop into a suitable parent, we must ask how much longer [the child] should have to wait to enjoy the permanency that is essential to her development and overall well-being." *Castro v. State Office of Family & Children,* 842 N.E.2d 367, 375 (Ind. Ct. App. 2006), *trans. denied.* Based on the evidence presented, we cannot say that the juvenile court clearly erred in concluding that there is a reasonable probability that the conditions that resulted in Child's placement outside the home would not be remedied.[2]

---

[2] We need not address Father's challenge to the juvenile court's conclusion that there was a reasonable probability that the continuation of the parent-child relationship posed a threat to Child's well-being because

Affirmed.

Riley, J., and Robb, J., concur.

---

Indiana Code section 31-35-2-4(b)(2)(B) is written such that, to properly effectuate the termination of parental rights, the juvenile court need only find that one of the three requirements of subsection (b)(2)(B) has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.